**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

CAROLE and ROBERT TESTWUIDE, *et al*.,

*Plaintiffs*,

v.

THE UNITED STATES OF AMERICA,

*Defendant.*

No. ______________________

# MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION


Kieron F. Quinn
Martin E. Wolf
Quinn, Gordon & Wolf, Chtd.
40 West Chesapeake Avenue
Suite 408
Towson, Maryland 21204
(410) 825-2300
(410) 825-0066 (fax)

Charles R. Hofheimer
Kristen Hofheimer
Charles R. Hofheimer, P.C.
303 34th Street, Suite 8
Virginia Beach, Virginia 23451
(757) 425-5200
(757) 425-6100 (fax)

Thomas Shuttleworth
Stephen C. Swain
Lawrence Woodward
Shuttleworth, Ruloff, Giordano & Swain, P.C.
Southport Centre, Suite 300
4525 South Boulevard
Virginia Beach, Virginia 23452-1137
(757) 671-6000
(757) 671-6004 (fax)

Jack E. Ferrebee
Jack E. Ferrebee, P.C.
Sandpiper Key, Suite 12B
1060 Laskin Road
Virginia Beach, Virginia 23451
(757) 425-2234
(757) 425-2217 (fax)

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

I. INTRODUCTION……………………………………………………………………...1

II. STATEMENT OF FACTS……………………………………………………….…..2
A. NAS Oceana And NALF Fentress…………………………………………….…..2
B. The Environmental Impact Statement……………………………………………4
1. Activity Levels and ATAC…………………………………………………..5
2. Noise Levels and the Wyle Report……………………………………..5
3. Noise………………………………………………………………………………7

III. THE CONSTITUTIONAL TAKING…………………………………………………11
A. The Impact at Oceana and Fentress……………………………………...13
1. Increased Usage…………………………………………………………13
2. Increased Noise………………………………………………………..14
3. Expanded APZs………………………………………………………15
4. Low Income Housing…………………………………………………16
5. The Noise Impact on Surrounding Properties……………………………16
(a) Class-Wide Effects on Use and Enjoyment……………………...17
(b) Class-Wide Effects on the Value of Subject Properties…………19

IV. CLASS CERTIFICATION……………………………………………………………22
A. Quinault (1) Is the class large but manageable?……………………………....25
B. Quinault (2): Is there a question of law common to the whole class?…………..…26
C. Quinault (3): Does the common legal question override separate factual issues?…………………………………………………………………………26
D. Quinault (4): Are the claims of the named plaintiffs typical of the class?……...29
E. Quinault (5): Has the government acted on grounds applicable to the whole class?…………………………………………………………….…..…29
F. Quinault (6): Were the damages allegedly suffered by the individual class members so small that it is doubtful they would be otherwise pursued?………...30
G. Quinault (7): Will the named plaintiffs adequately and fairly protect the interests of the class?…………………………………………………………….30
H. Quinault (8): Is there a risk of inconsistent adjudications if individual actions are separately maintained?……………………………………………31
I. Equitable Test: Does certifying this case as a class action serve the interests of justice?………………………………………………………….32
J. Certification of an Opt-out Class……………………………………………...32

V. CONCLUSION………………………………………………………………………..34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases


| | |
|---|---|
| Aaron v. United States, 311 F.2d 798 (Ct. Cl. 1963) | 12 |
| Adams v. United States, 1982 U.S. Ct. Cl, LEXIS 2411 | 6 |
| Advisory Committee Notes to Rules of Civil Procedure, Rule 23, 39 F.R.D. 69 (1966) | 29 |
| Argent v. United States, 124 F.3d 1277 (Fed. Cir. 1997) | passim |
| Armitage v. United States, 18 Cl. Ct. 310 (1989) | 23, 25 |
| Berkley v. United States, 45 Fed. Cl. 224 (1999) | 23, 24, 31 |
| Black v. United States, 24 Cl. Ct. 471 (1991) | 23 |
| Branning v. United States, 228 Ct. Cl. 240 (1981) | passim |
| Buchanan v. United States, 27 Fed. Cl. 222 (1992) | 23, 24, 29 |
| Christian v. United States, 46 FED. CL. 793 (2000) | 24 |
| Cohen v. Uniroyal, Inc., 77 F.R.D. 685 (E.D. Pa. 1977) | 26 |
| Cooke v. United States, 1 Cl. Ct. 695 (1983) | 33 |
| Cooper v. Federal Reserve Bank, 467 US 867 (1984) | 33 |
| Favreau v. United States 2000 U.S. Claims, LEXIS 227 (October 25, 2000) | 23 |

| | |
|---|---|
| Glassine and Greaseproof Paper Antitrust Litig, 88 F.R.D. 302 (E.D. Pa. 1980) | 26, 27 |
| Gold Strike Stamp Co. v. Christensen, 436 F.2d 791 (10th Cir. 1970) | 29 |
| Hannon v. United States, 31 Fed. Cl. 98 (1994) | 25, 29, 30 |
| In Re New York City Municipal Securities Litigation, 87 F.R.D. 572 (S.D.N.Y. 1980) | 26, 31 |
| Johnson v. Airport Auth. Of Omaha, 115 N.W. 2d 426 (Neb. 1962) | 11 |
| Joseph v. General Motors, 109 F.R. D. 635 (D. Colo. 1986) | 29 |
| Kominers v. United States, 3 Cl. Ct. 684 (1983) | 24 |
| Lacey v. United States, 595 F.2d 614 (Ct. Cl. 1979) | 12 |
| Milonas v. Williams, 691 F.2d 931, (10th Cir. 1982) cert denied, 460 U.S. 1069 (1983) | 26 |
| Moore v. United States, 41 Fed. Cl. 394 (1998) | 24, 25, 26, 29 |
| O'Hanlon v. United States, 7 Cl. Ct. 204 (1985) | 23 |
| Peil v. Speiser, 97 F.R.D. 657 (E.D. Pa. 1983) | 25 |
| Quinault Allotte Association v. United States, 197 Ct. Cl. 134 (1972) | passim |
| Rodriguez v. Bar-S Food Co., 567 F. Supp. 1241 (D.Colo. 1983) | 25 |
| Schwartz v. Harp, 108 F.R.D. 279 (C.D. Cal. 1985) | 25 |
| Simon v. Westinghouse Elec. Corp., 73 F.R.D. 480 (E.D.Pa. 1977) | 31 |
| Steiner v. Equimark Corp., 96 F.R.D. 603, 609 (W.D. Pa. 1983) | 29 |
| Taylor v. United States, 41 Fed. Cl. 440 (1998) | passim |
| United States v. Brondum, 272 F.2d 642 (5th Cir. 1959) | 11 |
| United States v. Causby, 328 U.S. 256 (1946) | passim |

## MISCELLANEOUS

Federal Interagency Committee on Noise, Report August, 1992 10

Federal Rules of Civil Procedure

Rule 23 (a)(1) Numerosity 25

Rule 23 (a)(2) Commonality 28

Rule 23 (b)(3) Predominance of Common Issues 28

Rule 23 (a)(3) Typicality 29

Rule 23 (a)(4) Adequacy of Representation 31

1 Newburg on Class Actions, supra §3.05, (1992) passim

OPANAV Instruction 11010.36A 4, 5, 10, 27

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CAROLE and ROBERT TESTWUIDE, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. ___________________________ |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

## I. STATEMENT OF THE CASE

This inverse condemnation action seeks compensation for classes of residential property owners dramatically affected by jet aircraft noise, which followed the arrival in 1998 of 156 F/A-18 twin jet Navy strike fighters at Naval Air Station Oceana ("Oceana") [1] in Virginia Beach, Virginia. The transfer was made because the Navy decided to shut down Cecil Field in Florida where virtually the entire Atlantic Fleet of F/A-18s previously was stationed. Clearly the Navy moved the F/A-18s to Oceana and Fentress with full knowledge that it would have a serious deleterious impact on the residential neighborhoods that surround those fields. That impact is laid out in a variety of ways in the Environmental Impact Statement ("EIS") issued by the Navy in connection with the transfer. (Excerpts of the EIS are attached as Exh. 1). Plaintiffs understand that the Navy's chief criterion has to be operational readiness and efficiency. The Navy in turn recognized that its actions would result in a large financial obligation running to those persons on whose property the aircraft would impose an avigation easement.[2] The Navy's EIS reveals no intent to deny its obligations and the Plaintiffs, in

[1] Including the nearby sister facility of Naval Auxiliary Landing Field, Fentress ("Fentress")

[2] The Chief of Naval Operations requested information on the noise impact of the realignment of the F/A-18s. In Memoranda dated January 28, 1998 and February 3, 1998 (Exh. 2; App. 0272) the Navy reported a "conservative" estimate of $30,000 per single-family dwelling to mitigate the noise. References to the Appendix of exhibits that accompany this memoranda are to the exhibit number and to the sequential page numbering of the Appendix.

turn, are not attempting to force the Navy to close its airfield. Nevertheless, the impact from the increased flight activity at Oceana constitutes the taking of an avigation easement from the surrounding residential properties for which the Constitution demands just compensation to the property owners.

## II. STATEMENT OF FACTS

### A. NAS Oceana And NALF Fentress

Oceana is located in the densely populated community of Virginia Beach, Virginia. Oceana, at 5,000 acres, is the Navy's smallest Naval Air Station. The next smallest, Miramar, is over 20,000 acres. Oceana's main facility consists of two paired 12,000 foot and two paired 8,000 foot runways. (Exhibit 3). Fentress is located in the adjoining community of Chesapeake, Virginia. (Map, Exh. 3, App. 0274). The combined population of these communities was approximately 545,045, in 1990 according to census data and is appreciably higher now. (EIS at Table 10-1 at 10-3,4).

Air operations at Oceana, and all other Naval Air Stations, are very different from civilian air operations. Military pilots train for combat at low altitudes and high speeds. Even within the military universe, Navy aircraft have their own unique operations that produce unique noise characteristics. Naval Aviation is by definition based in large part on aircraft carriers, not land-based airfields. Consequently, Naval and Marine Corps Air Stations focus a significant amount of attention and resources on the unique skill of landing on aircraft carriers. This unique training regimen is known as Field Carrier Landing Practice ("FCLP").

This practice has been described using slightly different nomenclature in *Branning v United States*, 228 Ct. Cl. 240, 244, 654 F.2d 88, 91 (1981) as follows:

> One type of training conducted on and around the station consists of practice landings and takeoffs designed to simulate aircraft carrier takeoffs and landings. One type of operation is referred to as "field mirror landing practice" (FMLP). In the course of such operation, the prescribed flight pattern requires the trainees to take off from the runway on the station and then fly defendant's aircraft directly over plaintiffs property in a "racetrack pattern" at an altitude of 600 feet above ground level (AGL) and return to the runway. The pattern is

> repeated by each aircraft several times, the training exercise being conducted squadron-by-squadron (and virtually nose-to-tail at 25 to 30 second intervals) over a period of several days during each month in which training is conducted.

Maps depicting the FCLP flight paths for Oceana and Fentress are attached as Exhibit 4. The FCLP flight pattern at Oceana dictates a maximum altitude of 1,000 feet while that at Fentress dictates that the aircraft never exceeds 800 feet in altitude and is never more than 1.75 miles from the center of the airfield. (ATAC Corp. Operational Study Exh. 7 at C-46, 47; App.. 0340-0341).

It is also vital for naval aviators to be able to land on an aircraft carrier at night. Consequently, FCLPs are conducted 24 hours a day and a significant percentage are between the hours of 10:00 p.m. and 7:00 a.m. (Wyle Laboratories Aircraft Noise Study, Exh. 8, Table 3-1 at 3-2, App. 0554; Table 3-2 at 3-3, App.. 0555; Table 4-16 at 4-27, App. 0572; Table 4-17 at 4-28, App. 0573). As explained below, the noise impact of FCLP is extraordinary because of the flight pattern (low altitude, high speed, high power) and time of training (twenty-four hours).

FCLPs also expand the concept of accident potential zones ("APZ"). In 1952, the "Doolittle Report" recommended that an area surrounding military airfields should be set aside as a buffer for aircraft accidents. The first APZ guidelines were issued in 1972 as part of an investigation into aircraft accidents. (Exh. 1 at 3.1-79, App. 0096). The APZ studies established a pattern of accident locations on or near the runways at military airfields. Since the early 1970s when APZs were first identified, there have been 632 aircraft accidents at Navy and Marine Corps airfields. A 13-year study by the Navy reports that 80% of serious accidents (defined as $1 million in damage or death) occurred in the APZs. (Exh. 1 at 3.1-79; 80, App. 0096-0097).

There are three identified APZs:

1. The Clear Zone, from the end of the runway extending 3,000 feet;
2. APZ 1, from the end of the clear zone extending 5,000 feet;
3. APZ 2, from the end of APZ 1 extending 7,000 feet.

The shape of the APZs for any given airfield is influenced by specific conditions, including local accident history and the type of operations. The APZs at Oceana and Fentress are elliptical, and mimic the FCLP flight patterns for those airfields. (Map, Wyle Fig. 4.403, Exh. 5, App. 0277).

**B. The Environmental Impact Statement**

In accordance with § 102(2)(c) of the National Environmental Policy Act of 1969 ("NEPA") (42 U.S.C. §§ 4331 et seq.), Chief of Naval Operations Instruction 11010.36A ("OPNAVINST")[3], and the Defense Base Closure and Realignment Act of 1990 (10 U.S.C § 2687), the Navy was required to prepare the EIS in connection with moving the Atlantic Fleet F/A-18s. In that EIS, five alternative realignment senarios ("ARS"), involving three air installations: (1) NAS Oceana, (2) MCAS Beaufort, South Carolina, and (3) MCAS Cherry Point, North Carolina were evaluated. The Atlantic Fleet has 180 F/A-18 Hornets, consisting of 11 squadrons of 12 F/A-18s each (132 aircraft) and a Fleet Replacement Squadron ("FRS") of 48 F/A-18s. The F/A-18 is the Navy's latest and most powerful carrier based strike-fighters.

The five realignment scenarios were:

**ARS 1**- Relocate all 11 F/A-18 squadrons and the FRS to NAS Oceana, a total of 180 aircraft.

**ARS 2**- **Relocate 2 F/A-18 squadrons to MCAS Beaufort (24 aircraft) and 9 F/A-18 squadrons and the FRS to NAS Oceana (156 aircraft).**

**ARS 3**- Relocate 3 F/A-18 squadrons to MCAS Cherry Point and 8 F/A-18 squadrons and the FRS to NAS Oceana.

**ARS 4**- Relocate 5 F/A-18 squadrons to MCAS Beaufort and 6 F/A-18 squadrons and the FRS to NAS Oceana.

**ARS 5**- Relocate 5 F/A-18 squadrons to MCAS Cherry Point and 6 F/A-18 squadrons and the FRS to NAS Oceana.

The EIS documented the existing use and projected environmental impacts at all three facilities and projected the increased use and impact for each ARS. Ultimately, the Navy selected ARS 2 for implementation. (Copy of Record of Decision of May, 1998 is attached as Exh. 6).

**1. Activity Levels and ATAC**

The EIS documents the present and projected future level of operations at Oceana and Fentress based on an airfield and airspace analysis conducted by ATAC Corporation of Sunnyvale, California. The airfield and airspace analysis, dated February 18, 1998 (Exh. 7 and EIS Appendix C, App. 0490-0492) was developed using a computer simulation model, NASMOD.

NASMOD was developed to meet the Navy's need for a technically and scientifically accurate tool to objectively and efficiently analyze options in a number of naval aviation operations. NASMOD is derived from: (1) Navy air training system model (NATS), and (2) SIMMOD the official simulation model, which the Federal Aviation Administration uses to make analogous studies of civilian airports. NASMOD, includes advanced database and analytical capabilities necessary to model complex tactical military training operations. [4]

The data used by ATAC is compiled from (1) records of actual air field and air space operations, including air traffic control facility logs, traffic analyzer data and squadron flight schedules, (2) publications, and (3) personal interviews and observations of operations. NASMOD then established the baseline operations at Oceana prior to the arrival of the F/A-18s and established the projected level of use for the first full year following the realignment, 1999. (Exh. 7 at C-29, App. 0324).

**2. Noise Levels and the Wyle Report**

Based on the activity levels established by ATAC, noise exposure levels and projections were calculated by another Navy contractor, Wyle Laboratories, Inc. Wyle develops aircraft noise exposure contours at various Navy installations. Those noise exposure contours are used to establish the Navy's Air Installations Compatible Use Zone program ("AICUZ"). AICUZ requirements are set out in OPNAVINST 11010.36A which identifies both accident and noise impacts from Navy and Marine

---

[3] This directive adopts the Navy and Marine Corps Air Installation Compatible Use Zones, or "AICUZ," described below.

[4] An extensive description of NASMOD is set out in the ATAC report, Exh. 7 at p.C-28, App. 0323.

Corps air stations. These are similar to those required of civilian aircraft and airports by the Noise Control Act of 1972 (Exh.1 at 3.1-78, App. 0095). The noise exposure contours for Oceana and Fentress both before and after the arrival of the F/A-18s are set out in a report to the Navy dated February, 1998 and incorporated into the EIS ("Wyle Report") (Excerpts of the Wyle Report are attached as Exh. 8, App. 0521-0672). That report was also summarized in the EIS. The Wyle Report itself contains much greater detail than the EIS and establishes the substantial negative impact the F/A-18s have on the properties surrounding Oceana and Fentress.[5]

The heart of the Wyle Report is the extraordinary contrast between noise exposure during the baseline year of 1997, and that projected during 1999, the first full year after arrival of the F/A-18s. Noise exposure contours show geographical areas exposed to particular noise levels. In producing the noise contours, Wyle Labs used the federal standard for aircraft noise exposure in communities around airfields and airports, the day-night average sound level (DNL) expressed in decibels (dB). (Id, at 1-2, App. 0544). DNL is the average sound level generated by all aviation related operations during an average 24-hour period. In calculating DNL, sound events during nighttime hours are increased to account for lower background noise and for the greater community sensitivity to noise during these times. Nighttime hours are defined as the period from 11:00 p.m. to 7:00 a.m. DNL is recognized as the best measure of the long-term community impact of aircraft noise. (Id., at 1-2 and A-6, App. 0544, 0592).

In calculating the noise contours, Wyle Labs used a suite of computer modeling programs, NOISEMAP[6], developed by the Air Force, the lead Department of Defense agency for aircraft noise modeling. NOISEMAP is highly accurate when comparing before and after noise effects from proposed operational changes and allows the Navy to accurately calculate noise for proposed actions without having to wait to measure actual noise after the event. (Id., at 1-4, App. 0546).

[5] The ATAC and AICUZ reports are both probative and admissible. *Adams v. United States*, 1982 U.S. Ct. Cl. LEXIS 2411 (May 19, 1982); *Branning v. United States*, 228 Ct. Cl. 240, 251 654 F.2d 88, 95-96 (1981).

[6] NOISEMAP is a suite of computer modeling programs which is extensively described in the Wyle Report at 1-4, 5.

NOISEMAP is able to visually depict the noise effects from aircraft by assembling the known noise and flight factors to create a highly accurate computer model of the noise levels at various locations. For Oceana and Fentress, Wyle plotted noise contours of 60, 65, 70, 75, 80 and >85 dB DNL, although the EIS condensed these contours into only > 65, > 70 and >75 dB DNL. (Id., at 1-4, 5, App. 0546-0547).

**3. Noise**

In order to understand the noise contours and the effects of aircraft noise on surrounding property, it is important to understand the fundamentals of noise, noise measurement and the documented effects of environmental noise. The following discussion on these topics is taken from the Wyle Report and the EIS.

Noise is one of the most prominent and intrusive environmental impacts associated with aircraft operations. Even with other sources of noise in today's environment, aircraft noise is readily identifiable as intrusive. This is particularly true of military aviation, which uses powerful and unmuffled jet engines. Thus, aircraft noise problems often dominate analyses of environmental impacts. (Id., at A-1, App. 0587).

In order to Appreciate the impact noise can have on surrounding people and property, it is important to understand how noise is measured and reported. Human perception of sound involves two characteristics, intensity and frequency. Frequency is the number of times per second the air vibrates. For example, low frequency sounds may be described as a rumble, where a high frequency sound may be described as a screech. (Id., at A-1, App. 0587).

Sound intensity is measured in a logarithmic unit known as a decibel. Normal speech has a sound level of about 60 dB, and 120 dB is the threshold of pain. (Id., at A-1;2, App. 0587-0588). Because decibels are logarithmic and not linear, comparing sound levels is not a matter of simple addition or subtraction. There are, however, some generally accepted rules for comparing sound levels. If a sound's intensity is doubled, the increase is 3 dB. In terms of the present controversy,

then, doubling of 60 dB DNL is 63 dB DNL, not 120 dB DNL. Another important factor when measuring average sounds over a period of time, is the time-average sound level, which is dominated by the louder sound levels during the averaging period. For example, a 100 dB sound for 30 seconds followed by a 50 dB sound for another 30 seconds produces a time-average sound of 97 dB for the 60-second period. This becomes important to explain Day-Night Average Sound Levels. (Id., at A-2, App. 0588). The DNL takes into consideration both the maximum sound level and the sound exposure level for a 24-hour period. (Id., at A-9, App. 0595).

Sound frequency is measured in cycles per second or hertz (Hz). Humans can hear sounds that range in frequency between 20 Hz to 15,000Hz but are most sensitive to sounds in the 1,000 to 4,000Hz range. When measuring environmental noise, the high and low frequencies are adjusted to Approximate the reduced sensitivity to those frequencies. This adjustment is called A-weighting and is used by Wyle Labs in measuring environmental noise. (Id., at A-3, App. 0589).

In measuring sounds for environmental impact, both the Department of Defense and the FAA have specified that the day-night average sound level (designated in decibels DNL or Ldn) should be used in preparing the noise exposure contours. Maximum sound level measures the highest A-weighted sound level during a sound event, such as an aircraft overflight. Sound exposure level measures both the sound level and duration of a single sound event. (Id., at A-4, App. 0590).

Noise affects people and the environment in a number of ways. A number of health effects are associated with environmental noise. The best defined of the health effects is noise-induced hearing loss. Based on scientific research and Federal workplace guidelines, a day-night average of 75 dB DNL is the threshold at which hearing loss could occur from aircraft noise. (Id., at A-10, App. 0596). This is consistent with findings of both the EPA (70 dB DNL) and National Academy of Sciences Committee on Hearing, Bioacoustics and Biomechanics (75 dB DNL) (Exh. 1 at 3.1-134, App. 0147).

Long-term noise exposure has also been associated with non-auditory health effects, such as cardiovascular problems, low birth weight and mortality rates. (Exh. 1 at 3.1-134, 136, App. 0147,

0149). Although those effects are not as well studied as hearing loss, (Exh, 1 at 3.1-136, App. 0149), they manifests themselves at the same noise levels as hearing loss (75 dB DNL) (Wyle Report, Exh. 8 at A-10, 11, App. 0596-0597).

There is a growing body of evidence that chronic exposure to aircraft noise can also result in learning deficits among school children. Several studies have documented reading deficits, impaired cognitive abilities and impaired speech perception among children living in close proximity to airports. (EIS, Exh. 1 at 3.1-138, App. 0151).

Another prominent effect of aircraft noise is community annoyance. Repeated studies have shown a high correlation between noise exposure and annoyance of groups of people. (Wyle Report, Exh. 8 at A-7, App. 0593). While average noise levels of 55 – 60 dB DNL have been proposed (and could be used) as the threshold of community annoyance, average noise level of 65 dB DNL has been more generally used. (Id., at A-12, App. 0598). This level is also (1) the level at which aircraft noise normally dominates other ambient noise sources, (2) the threshold for grant-in-aid funding of airport noise mitigation projects and (3) the ceiling level established by HUD and Veterans Administration for federally guaranteed home loans. (Wyle Report at A-12).

Other common effects of noise-induced community annoyance are speech interference, sleep interference and vibration of structures and objects. (Id., at A-12 through 20, App. 0598). Of these, speech interference from aircraft noise is the primary cause of annoyance. Aircraft noise can disrupt routine daily activities such as conversation, television or radio, reading, work and telephone use. It disrupts more formal speech settings such as in the classroom or office. This often leads to fatigue and vocal strain for those who must speak above the aircraft noise. Indoor noise levels in excess of 60 dB interferes with speech communication. (Id., at A-12, App. 0598).

Aircraft noise is particularly disruptive to sleep. Sleep interference manifests itself in awakening, sometimes referred to as “arousal”, and in changes in “sleep stage” in which the subject shifts from one stage of sleep to another. The EPA has identified a sound level of 45 dB DNL and

below as necessary to protect against sleep interference. (Id., at A-14, App. 0600). Quality sleep is a requisite to good health. (EIS, Exh. 1 at 3.1-137, App. 0150).

Finally, vibration of structures and objects is a source of annoyance among groups of people. While high noise levels lasting for more than one second are likely to damage structures, secondary vibration of objects in a house can occur at much lower noise levels. Vibration of pictures, dishes and other objects contribute to annoyance and fear of breakage. (Wyle Report, Exh. 8 at A-20, App. 0606).

Using this generally accepted scientific understanding of environmental noise and its measurement, the Navy then evaluated the noise impact to the properties in the various noise exposure contours around Oceana and Fentress. As part of AICUZ, the Navy developed a table of compatible land uses within each noise exposure contour. (A copy of OPNAVINST 11010.36A is attached as Exh. 9, App. 0673-0711). The current AICUZ compatible land use table is set forth separately as Exhibit 10. Note that all residential use is prohibited in noise exposure contours above 75 dB DNL.

One of the most immediate and significant effects that aircraft noise has on surrounding property is reduction in market value. The Federal Aviation Administration recognizes that a wealth of economic studies lead to the inescapable conclusion that increased aircraft noise lowers property values. Aviation Noise Effects at 100 (Exh. 11, App. 0817). Indeed, Congress has long-recognized that proximity to an airport, with the attendant noise and other intrusions, depreciates the value of surrounding property. *See Federal Interagency Committee on Noise, Technical Report* (August, 1992) at pp. 3-18; 19, hereafter, "FICON." Copy attached as Exh. 12, App. 0903-0904. There, FICON reports that the Housing and Urban Development Act of 1965 charged HUD with the task "to determine feasible methods of reducing *the economic loss and hardships suffered by homeowners as a result of the depreciation in the value of their properties following the construction of airports in the vicinity of their homes.*" (FICON, Exh. 12 at pp. 3-18; 19, App. 0903-0904) (emphasis supplied). The transfer of F/A-18s to Oceana and the public's reaction to the transfer amply demonstrates this point.

Exhibit 13 hereto is a selection of articles and letters to the media in the affected area after the arrival of the F/A-18s testifying to the stark impact they have had on surrounding properties. As explained below, there are well-recognized methods for determining the impact that aircraft noise has on property values.

**III. THE CONSTITUTIONAL TAKING**

An easement to fly aircraft over a parcel of land is commonly referred to as an avigation easement. 6A *Nichols' Eminent Domain*, 3d ed., § 36.03[2][a] at 36-27 (Matthew Bender 2000)(hereafter, "Nichols at __"). In contrast to an avigation easement, airport owners and operators may also (and sometimes do) acquire clearance or land use easements which restrict the use of property below the glide path of aircraft to increase "the margin of safety for flying by assuring that a pilot's vision will not be obstructed by natural growth or man-made obstructions above a designated altitude." *Johnson v. Airport Auth. Of Omaha*, 115 N.W.2d 426, 435 (Neb. 1962). A clearance easement has nothing at all to do with the right to fly over land; it is strictly an easement to cut trees, remove natural growth and remove man-made obstructions above a certain height. *United States v. Brondum*, 272 F.2d 642, 644 (5th Cir. 1959). Because the two easements are different, the taking of a clearance easement does not preclude the subsequent taking of an avigation easement. *Brondum*, 272 F.2d at 646.

In the absence of formal condemnation proceedings, an avigation easement is taken by frequent flights over or near a parcel of land that causes a substantial interference with the use and enjoyment of the land. *Argent v. United States*, 124 F.3d 1277, 1282 (Fed. Cir. 1997); *Branning v. United States*, 228 Ct. Cl. 240, 258 (1981). In such a case, the property owner is entitled to just compensation for the taking of the avigation easement. *Branning at 262-264*.

The seminal case involving a taking of an avigation easement by military aircraft overflight is *United States v. Causby*, 328 U.S. 256 (1946). There, a property owner claimed that the Air Force conducted frequent low-altitude flights over his farm during takeoff and landing at a nearby Air Force

Base. It was held that such persistent and continuous overflights resulted in the taking of an avigation easement. 328 U.S. at 261.

In the wake of *Causby*, some federal cases Applied a mechanical rule that only flights directly over the subject property, at altitudes less than 500 feet in noncongested areas and 1,000 feet in congested areas, could result in compensable takings. *See Lacey v. United States*, 595 F.2d 614, 616 (Ct.Cl. 1979); *Aaron v. United States*, 311 F.2d 798, 801 (Ct.Cl. 1963). In 1981, this Court expressly recognized that even overflights above those altitudes could constitute a compensable taking. *Branning v. United States*, 654 F.2d 88 (Ct.Cl. 1981). In *Branning*, military flights from MCAS Beaufort simulated aircraft carrier landings, a particularly noisy and intrusive flight pattern.[7] The Court held that overflights above 500 feet (in a non-congested area) constituted a compensable taking of an avigation easement because the noise attendant to such overflights was severe enough as to cause a diminution in the value of the subject property. 654 F.2d at 102.

More recently, the Court of Appeals for the Federal Circuit held that the mechanical limitation based on the altitude at which airspace is declared to be "public" (direct overflight below 500/1,000 feet) was not the proper standard for determining whether a compensable taking has occurred:

> Although federal courts have, by and large, required the facts of a case to match the *Causby* paradigm before allowing recovery, nothing in *Causby* or the intervening precedent limits a takings claim to only those facts. Indeed, overflight takings disputes defy per se rules or classification. [citations omitted] Rather, precedent requires, consistent with the purpose of the Takings clause, a remedy for government action that singles out a private landowner to bear a disproportionate burden for a public benefit. [citations omitted] Thus, while the facts, reasoning, and rules of *Causby* have always guided this corner of takings law, they do not imprison it.

*Argent v. United States*, 124 F.3d 1277, 1282 (Fed. Cir. 1997)(emphasis supplied). There, property owners surrounding a Navy airfield in Washington State claimed that the noise from military aircraft flying over and near their properties substantially interfered with the use and enjoyment of their properties. This Court entered summary judgment against one group of plaintiffs on the ground that

they did not establish that the flights were below 500 feet in altitude and directly over their property. 124 F.3d at 1279. The Federal Circuit reversed as to these plaintiffs, holding that neither direct overflight nor maximum altitudes are required if the activity, as a whole, is sufficiently intrusive (124 F.3d at 1284):

> The Argents are not before this court to complain of individual flights, which may or may not pass over their property. Rather, they complain of the entire course of operations at OLF Coupeville that entails hundreds of flights per week – an allegedly constant source of noise and disruption. If true, this activity is a peculiar burden imposed on the Argents and their neighbors by the United States' selection of a remote site for aircraft training operations.

In the wake of *Argent*, the test for whether military overflights constitute a compensable taking is no longer governed by a bright line of maximum altitude or flights directly over the subject property. Where the flight activity, viewed as a whole, is so disruptive as to impose a peculiar burden on the neighborhoods adjacent to the airfield rather than the public at large, then a taking of an avigation easement has occurred.

## A. The Impact at Oceana and Fentress

### 1. Increased Usage

After July 1, 1998, the first 156 F/A-18s began to arrive at NAS Oceana from NAS Cecil Field. The projected and actual increase in operations, and noise, at Oceana and Fentress has been dramatic. Moreover, those increased operations are concentrated in two flight patterns - FCLP and touch-and-go - that have heightened noise impact on the surrounding properties.

The total operations at Oceana increased from the 1997 baseline of 108,897 to the 1999 projection of 218,631, an increase of 101%. In 1997, Oceana conducted 54,088 touch-and-go operations and no FCLP. In 1999, Oceana was projected to conduct 116,656 touch-and-go operations,

[7] Field carrier landing practice ("FCLP") is described more fully supra in section 1.

an increase of 115%, and 2,720 FCLP.[8] (Wyle Report, Exh. 8 at 3-2; Table 3-1; p. 4-26, 27; Table 4-16, App. 0554, 0571-0572).

Fentress sustained similar increases. The 1997 baseline operations were 104,668. The 1999 projected operations are 143,647, a 37% increase. This increase of 38,979 consists almost entirely of FCLP. In 1997, NALF Fentress conducted 95,476 FCLP operations. That number was projected to increase by nearly 34,000 to 129,087. (ATAC Report, Exh. 7 at C-162; 163, Tables A-17 and A19, respectively, App. 0448 - 0449).

As explained above, FCLP is a particularly intrusive flight pattern because of the high speed, high power, low altitude and repetitive pattern. *See Branning* at 243-244. This results in significant noise impact to nearby properties and to an expanded and elliptical APZ. These impacts are described more fully below.

**2. Increased Noise**

The noise impact of the 156 F/A-18s is devastating to the people and properties surrounding Oceana and Fentress. Wyle Labs established noise contours for both 1997 and 1999 of 65-70 dB DNL, 70-75 dB DNL, 75-80 dB DNL, 80-85 dB DNL and >85 dB DNL. (Wyle Report, Exh. 8 at 4-30, App. 0575). The noise contours were plotted on maps, copies of which are attached as Exhibits 14 and 15.

The increases in the noise affected area and population from 1997 to 1999 are astronomical.[9] Table 4-20 from the Wyle Report (App. 4-34) compares the affected areas for each ARS both before and after the realignment. Professor Jon Nelson[10] extracted the pertinent data for Oceana and Fentress and calculated the increases in his Table 1 reproduced here:

---

[8] This estimate, as bad as it is, severely understates the actual noise impact since Oceana actually conducted Approximately 20,000 FCLP during this year. See Declaration of Robert Testwuide, Exh. 20.

[9] Wyle Labs used the U.S. Census Bureau's 1990 census data to calculate population. The Virginia Beach area has experienced high annual population growth between 1990 and 1997 and thus the actual affected population is significantly larger.

[10] Dr. Nelson is an economist retained by Plaintiffs in this case. His report is attached as Exhibit 16.

**Table 1. Estimated Land Acres and Population within DNL Contours at NAS Oceana and NALF Fentress**

| Noise Contour (dB) | Baseline Acres | ARS-2 Acres | Baseline Population | ARS-2 Population | Pop. Change | Pct. Increase |
|---|---|---|---|---|---|---|
| **DNL 60-65** | 11235 | 22720 | 29627 | 49011 | + 19,384 | 65.4 |
| **DNL 65-70** | 9217 | 18933 | 19823 | 40877 | + 21,054 | 106.2 |
| **DNL 70-75** | 4428 | 13209 | 7837 | 32635 | + 24,798 | 316.4 |
| **DNL 75-80** | 618 | 10817 | 366 | 23732 | + 23,366 | 6384.2 |
| **DNL 80-85** | 35 | 8901 | 4 | 13607 | + 13,603 | not calc. |
| **DNL 85+** | 0 | 6510 | 0 | 9812 | + 9,812 | not calc. |
| **Totals by Contour** | | | | | | |
| **Total: DNL 65-79** | 14263 | 42959 | 28026 | 97244 | +69,218 | 247 |
| **Total: DNL 80+** | 35 | 15411 | 4 | 23419 | + 23,415 | not calc. |

*Source*: Wyle (1998 at Table 4-20). Acres are off-station and exclude bodies of water and airfield areas.

Table 1 shows that Approximately 49,000 people now live in a noise level that the Navy, as well as other authorities, has determined to be unfit for residential use (>75 dB DNL). Nearly 10,000 people now live in a noise level greater than 85 dB DNL 24 hours a day. Prior to the arrival of the F/A-18s no person lived in that noise zone. More than 13,000 now live in a noise zone of between 80-85 dB 24 hours a day. Prior to the move, only 4 people lived in that noise zone. Nearly 24,000 people now live in 75-80 dB 24 hours a day; prior to realignment, only 366. Over 32,000 now live in 70-75 dB 24 hours a day; before, only about 7,800. Finally the number of people who live with 65-70 dB around the clock has more than doubled (40,877 compared to 19,823).

**3. Expanded Accident Potential Zones**

The increased noise and, particularly the increased FCLP and other touch-and-go operations, significantly increase the size of the APZs. The 1999 APZs for both Oceana and Fentress are shown in Exhibit 15, App. 1001. It is apparent that the APZs encircle the runways at each landing field as a result of the FCLP patterns, which are identical to the shape of the APZs. The size of the APZs at Oceana increased by 1,751 acres with the single greatest increase coming in the residential land use category. (EIS at 4.4-4, Table 4.4-1). The significance of this expansion cannot be overstated. In 1993, in a written advisory to the Commanding Officer for Naval Air Atlantic in Norfolk concerning

the proposed closure of NAS Cecil Field, the Commanding Officer of the Strike Fighter Wing Atlantic at NAS Cecil Field, stated:

> …. Sir, I am sure you are well aware of the eleven schools, multiple shopping malls as well as civilian housing developments under the landing pattern at NAS Oceana. This situation will only worsen in the coming years as Oceana is pinned against the coastline of a major resort area. At present there is only a very narrow unobstructed Approach into Oceana from the Southwest, which will soon be closed by housing developments. Of all the bases on the east coast, Oceana is by far the most encroached. The danger of a mishap with the potential for large numbers of civilian deaths must be factored into this process. When the inevitable happens, and we lose an aircraft in the pattern, I would rather it land in the pine forest that surrounds Cecil.

(Exh. 17, App. 1049-1050; emphasis supplied).

A local ordinance in Virginia Beach requires anyone selling property in an APZ to provide a written disclosure of that fact to prospective buyers. Also, federally guaranteed mortgage programs administered by HUD, FHA and VA impose restrictions on loans for homes in APZs. (EIS at 4.4-6).

**4. Low Income Housing**

The negative impact from the F/A-18s is disproportionately imposed on low-income persons. For example, the Navy admits that nearly 24% of the households surrounding Oceana that suffered an increase in noise zones are low income.[11] (EIS at 10-2; 10-5,6; Table 10-2).

**5. The Noise Impact on Surrounding Properties**

The following elements discussed in this memorandum all have an adverse impact on the property values in the areas adjacent to Oceana and Fentress:

- The increased size and noise of the F/A-18s which are more than twice as loud as the F-14 at takeoff and landing;
- The drastic increase in operations at Oceana and Fentress amounting to a 101% increase with a substantial portion of those operations being FCLP;
- The substantial increase in night operations;

[11] The figure is actually higher, since the Navy compared the 1999 noise contours with 1978 noise contours. The EIS gives no comparison between the change from the 1997 noise contours to the 1999 noise contours.

- The expansion of the APZs and the attendant fear of the population living under that threat;
- The complaints of thousands of citizens living under twenty-four hour noise averages deemed by the government and by science to be incompatible with human residence;
- The justifiable fear of noise induced health effects;
- The reduction in the market value of affected properties as a result of the increase in jet noise.

These factors combine to cause the affected property owners to want to move from the noise zones and potential buyers to shun those same areas.

**(a) Class-Wide Effects on Use and Enjoyment**

Attached to this memorandum are declarations of the named Plaintiffs in this case, Sandra and James Lyles (Exhs. 18 and 19, App. 1051-1053; 1054-1055), George Bunn (Exh. 20, App. 1056-1058), Joseph LoCasto (Exh. 21, App. 1059-1061), Robert Testwuide (Exh. 22, App. 1062-1064), and Ronald Green (Exh. 23, App. 1065-1066). In these declarations, the Plaintiffs recite their experiences from the increase in overflights and related noise, and the effect it has had on the use and enjoyment of their properties. It is clear that they all are affected in the same way; each Plaintiff's use and enjoyment of his or her respective property has been severely affected by the increased noise of the F/A-18s.

Sandra and James Lyles, for example, own the property located at 950 Maryland Avenue in the Shadowlawn neighborhood of Virginia Beach. The Lyles Property is in the 65-79 dB DNL noise zone. Although they are not in the highest noise zones, both Mr. and Mrs. Lyles verify that the F/A-18s emit a high-pitched shrill sound that causes pain, prevents their ability to watch television, carry on conversations, read a book, and even sleep through the night. The disruption from jet noise is a frequent occurrence, often lasting for hours at a time, day after day. As a result, the Lyles no longer can enjoy the outdoor lifestyle that was a large part of the value of their property in this beachfront community.

George Bunn owns the property located at 320 A Scott Lane in the Oceana Gardens neighborhood. The Bunn Property is in the >80 dB DNL noise zone. The Bunns have a 1-year old child who is often awakened by the jet noise. Tragically, the Bunns have to cover their baby's ears when jets fly over to try to stop the physical pain that is apparent from his reaction. And often there is no escape for the Bunns since their house does not have air conditioning. Consequently, they must leave their windows open during warm weather and do not even get minimal relief from the noise. Grace and Joseph LoCasto live at 1105 Murray Drive near the Fentress auxiliary landing field. Their house is in the 65-79 dB noise zone. Mr. LoCasto is retired from the Naval Exchange Command where he worked as the Sales Promotion Director until 1995. The LoCastos evaluated the jet noise, both day and night, when they purchased their home in 1993. The noise was livable and remained so until the F/A-18s were transferred in 1998. Since that time, the noise has been unbearable, despite the all brick construction, added insulation and double pane windows. The constant flights have made outdoor activities impossible, including using their patio and swimming pool. Since the F/A-18s arrived, the LoCastos have been blasted out of bed more than 100 hundred times from night flights and Mr. LoCasto needs to use earplugs to get back to sleep.

Carole and Robert Testwuide have lived at 916 North Oriole Drive since 1986. Their property is in the 65-79 dB noise zone. Mr. Testwuide is a retired Naval Aviator who has long been familiar with jet noise. Prior to the arrival of the F/A-18s, the jet noise was tolerable. Since the F/A-18s, however, routine daily activities have become impossible, such as, conversation, use of the telephone, watching television and any outdoor activity. (Exh. 23). The noise is far greater than the Testwuides ever experienced and far greater than they were led to believe it would be by the Navy during the EIS process. That may be due to the fact that actual operations at Oceana have far exceeded that which was reported by the Navy. Recently, Mr. Testwuide attended a meeting at which Capt. Zobel, the commanding officer of Oceana, reported that Oceana conducted 20,000 field carrier landing practices

last year. The environmental impact study estimated that there would only be about 2,900 last year. The Testwuides are seriously considering trying to sell their house as a direct result of the jet noise.

Karen and Ronald Green have lived at 114 London Bridge Road for the past seventeen years. Their property is in the 65-79 dB noise zone. Mr. Green suffered a hearing loss several years ago unrelated to jet noise. Despite the fact that he is hard of hearing, the noise since the F/A-18s arrived is unbearable. When jets are flying directly overhead, he has to put his fingers in his ears because of the pain. It has been so bad, that he has left town several times to escape the noise.

**(b) Class-Wide Effects on the Value of Subject Properties**

Professor Jon P. Nelson, a professor of economics at Pennsylvania State University, is this nation's leading expert on the economic impact of aircraft noise on residential property values. Dr. Nelson's report is Exh. 16, App. 1002-1048. Since first becoming associated with Penn State in 1969, Dr. Nelson has concentrated his research in the areas of environmental economics and applied microeconomics. In particular, he has conducted research into the impact of environmental noise (including aircraft noise) on residential property values. He has also extensively reviewed the economic and appraisal literature on the subject. Dr. Nelson is the author of *Economic Analysis of Transportation Noise Abatement*, (Ballenger, Cambridge, Mass. 1978). This work was cited by the FAA in its 1985 report on airport noise and the effect on housing prices, and formed the basis for the FAA's assessment of compensation under its Part 150 program for commercial airports. Dr. Nelson has also authored or co-authored several articles on the same topic, including: *Housing Values, Census Estimates, Disequilibrium, and the Environmental Cost of Airport Noise: A Case Study of Atlanta*, Journal of Environmental Economics and Management, June 1985; *Measuring Benefits of Environmental Improvements: Aircraft Noise and Hedonic Prices*, Advances in Applied Micro-Economics, V.K. Smith (ed.) (JAI Press, 1981); *Airports and Property Values: A Survey of Recent Evidence*, Journal of Transport Economics and Policy, January, 1980; *Airport Noise, Location Rent,*

*and the Market for Residential Amenities*, Journal of Environmental Economics and Management, March, 1979. (See extensive list of publications attached to Exh. 16, App. 1044-1047).

It is Professor Nelson's conclusion that damages in the form of diminution in value as a result of the dramatic increase in noise from the realignment of the F/A-18s can be calculated on a class-wide basis. Such damages have been identified and calculated in dozens of studies throughout the United States and other countries using multivariate regression analysis and other recognized methodologies to isolate the economic effect of aircraft noise. (Exh. 16, ¶¶ 29-34, App. 1015-1019). In fact, as Professor Nelson states: "there is a broad scientific consensus on the measurable impacts of aircraft noise." (Id. ¶ 34, App. 1018-1019). Indeed, the FAA has expressly acknowledged the validity of this work by Dr. Nelson and others in its 1985 report on the effects of aviation noise. (See, Exh. 11 at pp. 99-102, App. 0816-0819).

Professor Nelson in his report explains the large number of studies of the impact of aircraft noise on property values and sets out specifically the calculations of the Noise Depreciation Index ("NDI") (Exh. 16, ¶¶ 34-39, App. 1018-1021) which Approach is accepted not only by economists but approved by both the Federal Aviation Administration and the Environmental Protection Agency. He concludes that each residential property that has sustained an increase in the DNL and is, after July of 1998, in the 65-79 dB DNL has sustained a diminution in property value of 1.0% per increased dB, while a property that has been placed in an DNL of 80 dB or above has sustained a 1.5% per increased dB diminution in value.

This conclusion is supported by the opinion of Wayne Hunsperger (Exh. 24, ¶ 6, App. 1069). Mr. Hunsperger is an appraiser who has earned the designations of MAI and SRA by the Appraisal Institute. MAI is the designation held by Appraisers who are experienced in the valuation and evaluation of commercial, industrial, residential and other types of properties. The SRA designation is held by appraisers experienced in the analysis and valuation of residential properties. Both

designations require a multi-day examination and thousands of hours of training and experience. (Exh. 24, ¶ 2, App. 1067).

Mr. Hunsperger has testified in numerous courts and has also lectured on various appraisal topics, including valuation of environmental injury to property. Mr. Hunsperger has advised and assisted environmental groups in Costa Rica on environmental property damage and systems for valuing such damage. Mr. Hunsperger has calculated damages and testified in environmental class actions as to class-wide damage to property from pollution using several recognized approaches. It is Mr. Hunsperger's opinion that class-wide damages can be calculated using the methods described by Dr. Nelson. (Exh. 24, ¶ 8, app. 1069-1070). The techniques that form the basis for Dr. Nelson's opinion are well-recognized and accepted in the field of real property appraising. (Exh. 24, ¶ 4, App. 1068).

Given the accepted methodology for determining class-wide damages, the actual damages for the subject properties can be calculated by multiplying the NDI (either 1% per dB or 1.5% per dB, depending on the noise zone) by the increase in dB sustained by a particular property to determine the percentage decrease in value. This percentage decrease would then be applied to the fair market value of the subject properties prior to the taking to determine the dollar damage figure. Given the NDI as established by Dr. Nelson, the calculation can be completed if two pieces of data are available: (1) the fair market value of the properties in 1998 prior to the arrival of the F/A-18s, and (2) the increase in dBs as a result of the F/A-18s.

The fair market value data for the subject properties is readily available. (Affidavit of Alexander M. Salzberg Exh. 25, ¶ 4, App. 1071). Mr. Salzberg is an appraiser in Virginia Beach, Virginia who has more than twenty-five years experience in real estate appraisal. Mr. Salzberg, a graduate of Old Dominion University (MBA) and The Wharton School of Business and Finance, University of Pennsylvania (B.S.), has performed thousands of Appraisals in the Virginia Beach and Chesapeake areas and is intimately familiar with the real estate records available in that area. He has

testified in many courts, both state and federal, and has been accepted as an expert witness in real estate appraisals numerous times. Mr. Salzberg reports that the 1998 assessment data for the subject properties is available from the local taxing authorities and such data reasonably reflects the fair market values of the subject properties. (Exh. 25, ¶ 4, App. 1071).

Finally, it is possible to determine definitively the identity of each property within each of the noise contours surrounding Oceana and Fentress, to determine the increase dB exposure for each property, and the associated tax valuation. Dr. John M. Morgan, III is a Professor of Geography and Environmental Planning at Towson University in Maryland. Professor Morgan is an expert in Geographic Information Sciences ("GIS"), the science of computerized mapping, whereby geographical information can be overlaid to show its precise location on a map. He is the director of Towson University's Center for Geographic Information Sciences, a service that employs 19 full-time employees and provides GIS services to government and commercial entities. (Affidavit of John M. Morgan, III, Exh. 26, ¶ 3, App. 1072). Dr. Morgan testifies that with the available data he can identify the noise contour for each subject property, both prior to and after the arrival of the F/A-18s and the associated tax valuation. (Exh. 26, ¶ 6, App. 1073-1074).

## III. CLASS CERTIFICATION

The Plaintiffs have filed the present complaint for themselves and on behalf of all similarly situated persons as members of two classes of single family and duplex residential property owners from whom the Navy has taken an avigation easement without just compensation in violation of the Fifth Amendment to the Constitution. The classes are defined as follows:

**Class 1 –80 + dB DNL**

Owners of all residential properties as of July, 1998, located in a noise zone of 80 or more dB DNL in the 1999 Noise Contours for NAS Oceana or NALF Fentress

and in a noise zone of at least 5 dB DNL lower in the 1997 Noise Contours, both as established by Wyle Laboratories, Inc. in Report 97-10 dated February, 1998.

**Class 2 – 65-79 dB DNL**

Owners of all residential properties as of July, 1998, located in a noise zone of 65-79 dB DNL in the 1999 Noise Contours for NAS Oceana or NALF Fentress and in a noise zone of at least 5 dB DNL lower in the 1997 Noise Contours, both as established by Wyle Laboratories, Inc. in Report 97-10 dated February, 1998.

This Court and the federal district courts use different rules, but similar concepts, when considering whether to certify class actions. This Court's RCFC 23 provides:

> A motion to certify a class action shall be filed with the complaint and comply with Rule 3(c), with service to be made as provided in Rule 4. The court shall determine in each case whether a class action may be maintained and under what terms and conditions.

RCFC 23 is discretionary, and grants the court considerable freedom to determine under what circumstances to certify a class and the terms and conditions of the class once it is certified. *Taylor v. United States*, 41 Fed. Cl. 440, 444 (1998) *Berkley v. United States*, 45 Fed. Cl. 224, 229 (1999); *Favreau v. United States*, 2000 U.S. Claims, LEXIS 227, 3 (October 25, 2000).

A number of earlier cases in this Court observed that class actions are "reserved for extraordinary cases and [are] generally disfavored." *O'Hanlon v. United States*, 7 Cl. Ct. 204, 206 (1985); see *Buchan v. United States*, 27 Fed. Cl. 222, 223 (1992); *Black v. United States*, 24 Cl. Ct. 471, 477 (1991); *Armitage v. United States*, 18 Cl. Ct.310, 312 (1989), *aff'd*, 991 F.2d 747 (Fed. Cir. 1993). This observation has been questioned in more recent cases and the class procedure has met with a more hospitable reception:

> The language disfavoring class actions originated in *O'Hanlon*, and Appears to have been premised merely on the fact that class actions were not frequently certified in this court. See *O'Hanlon*, 7 Cl. Ct. at 206. The lack of class actions prior to *O'Hanlon* may be attributed more to the fact that previous cases were not suited for class action resolution than to a generalized belief that they should not be certified in this

> court. After *O'Hanlon*, however, courts Appeared to treat the disfavored status language as a general rule, rather than making an individual determination regarding the propriety of each class action. Considering the discretionary nature of RCFC 23 and the fact that it calls for a case-by-case determination, there Appears to be no basis for stating that class actions are "generally disfavored" and should be used only in "rare and extraordinary cases."

*Taylor*, *41* Fed. Cl. at 444; See also *Favreau*, 200 U.S. Claims LEXIS at 15; *Berkley*, 45 Fed. Cl. at 228; *Christian v. United States*, 46 Fed. Cl. 793, 818 (2000).

Despite the articulated historical reluctance to certify class actions, the principal case interpreting RCFC 23, *Quinault Allottee Association v. United States*, 197 Ct. Cl. 134, 453 F.2d 1272 (Ct. Cl. 1972), acknowledged this Court's ability to provide class-wide relief, recognized the historical acceptance of class actions, and ultimately certified plaintiffs' class. 453 F.2d at 1275, 1277. *Quinault* accurately described the device as a "modern aid to speedier and less repetitious litigation." Id. at 1274.

Although the federal district courts and this Court apply different rules when certifying a class, the *Quinault* criteria were drawn from and are influenced by Federal Rule 23, and cases applying Fed. R.Civ.P. 23 are instructive. *Berkley*, 45 Fed. Cl. at 220. The *Quinault* criteria are:

> (1) members must constitute a large but manageable class; (2) there is a question of law common to the whole class; (3) a common legal issue overrides separate factual issues affecting individual members; (4) claims of the party plaintiffs are typical of claims of the class; (5) the Government must have acted on grounds generally applicable to the whole class; (6) the claims of many claimants must be so small that it is doubtful they would be otherwise pursued; (7) the party plaintiffs must adequately and fairly protect the interests of the class without conflicts of interest; and (8) the prosecution of individual lawsuits must create a risk of inconsistent or varying adjudications.

*Buchan*, 27 Fed. Cl. at 224; See *Quinault*, 453 F.2d at 1276. In addition to the *Quinault* criteria, this Court considers whether certification of the class action would serve the interests of justice. See *Moore v. United States*, 41 Fed. Cl. 394 (1998); *Kominers v. United States*, 3 Cl. Ct. 684, 686 (1983). In this memoranda Plaintiffs will set out the *Quinault* criteria as they Apply to the facts of this controversy and shall also discuss the parallel provisions of Fed. R.Civ. P. 23 when those provisions are useful.

**A. Quinault (1): Is the class large but manageable?**

The cases on this factor vary but the present class, exceeding 19,000 residential properties, clearly fits both criteria. In *Hannon v. United States*, 31 Fed. Cl. 98, 103 (1994) the numerosity requirement was satisfied by a class of 340 plaintiffs and in *Taylor* 41 Fed. Cl. 445 a class of "at least" 213 was certified. In *Favreau* the Court certified a class of over 500 persons, ___ 2000 U.S. Claims LEXIS 227, *5, while in *Armitage v. United States*, 18 Ct. Cl. 310, 313 (1989), numerosity was satisfied by 100,000 class members (albeit certification was denied for other reasons). The court has discretion to determine on a case-by-case basis whether a proposed class is sufficiently large, and in this case, the answer is clear.

For example, referring to Nelson Table 1 set out above, there are almost 10,000 people living with a twenty-four hour average noise level of 85 dB DNL or above where there was not one such person subjected to that level during the baseline year of 1997. Compared to 1997 the arrival of the F/A-18s expose 45,852 new people to the 65-60 75 dB Ldn noise zone and 46,781 new people to the 75 plus dB Ldn noise zone. Under any criterion, numerosity is satisfied.

In determining whether a class is manageable, the court considers whether the members of the class are readily identifiable, easily reachable, and whether there are factual distinctions that would interfere with resolution of the issues and thus undermine the manageability of the class. See *Moore*, 41 Fed.Cl. 394, *Hannon*, 31 Fed. Cl.at 103; *Armitage*, 18 Cl. Ct. at 313-14; *Taylor*, 41 Fed. Cl. at 445. As the affidavit of Professor Morgan establishes, the properties and the class members are in a well defined geographical area and can be identified and located with a high degree of precision.

**Federal Rule 23 (a)(1): Numerosity**

Plaintiffs need not present evidence on the exact size or identity of class members. A common-sense estimate based on the circumstances of the case is sufficient. *Schwartz v. Harp*, 108 F.R.D. 279 (C.D. Cal. 1985). *Peil v. Speiser*, 97 F.R.D. 657 (E.D. Pa. 1983); *Rodriguez v. Bar-S Food Co.*, 567 F.Supp. 1241, 1247 (D.Colo. 1983). As Professor Newberg points out, "[T]his . . . issue ordinarily receives only summary treatment . . . and has often gone uncontested " in cases where the proposed class size is in the hundreds or thousands. 1 Newberg on Class Actions, supra §3.05, (1992)

**B. Quinault (2): Is there a question of law common to the whole class?**

This criterion is satisfied when there is a core legal question that is likely to have one common defense. See *Taylor*, 41 Fed. Cl. 445; *Moore*, 41 Fed. Cl. 394. In this case every member of the class owns residential property within a decibel contour which both the scientific evidence, and the law, recognize as severely affected by jet aircraft noise to the point where the finding of a Constitutional Taking is highly probable. The class definitions require that the residential property be squarely within a noise contour which the United States has already admitted is on and even above the border of human tolerance. If, for example, the Court determines that a residential property owner who is required to live with a 75 dB LDN has been the subject of a Constitutional Taking then as a matter of logic the Court must find that there was a taking of all class members' property who live with similar jet engine noise.

> While there are limited factual differences among the plaintiffs concerning damages, where damages are the sole issue requiring a special determination, class certification should not be ruled out ... . In this case, the core legal question, whether defendant violated the Act, is shared by the entire class. Factual differences involved in the damages determination are separate from the common issues of law.

*Taylor*, 41 Fed. Cl. at 445-446. (citation omitted); see *Favreau*, ____ U.S. Claims LEXIS 227, *11.

**Federal Rule 23 (a)(2) Commonality**

Rule 23(a)(2) requires that there be common questions of law or fact which pertain to the class as a whole. *Compare*, *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685, 690 (E.D. Pa. 1977) (common nucleus of fact) with *In re Glassine and Greaseproof Paper Antitrust Litig*, 88 F.R.D. 302, 304 (E.D. Pa. 1980) (common legal questions). Individual factual variations among members of a class is tolerated and will not defeat class adjudication. *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982), cert denied, 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983).

**C. Quinault (3): Does the common legal question override separate factual issues?**

> Factors relevant to this criterion are whether there are numerous factual issues that would require individual determination, whether there would be a delay of prompt resolution of the case because of these separate factual issues, and whether there is difficulty identifying the members of the class.

*Taylor*, 41 Fed. Cl. at 446 (citations omitted). If there were no studies establishing precisely the Noise Zones, the Accident Potential Zones, and the flight paths for the various aircraft operations then the location of each property within the plaintiff class with respect to the noise elements required by *Causby* and *Argent* could be viewed as an individual factual issue. But the location of the class residential properties, and the amount of noise to which they are subjected, are established as a matter of fact by admissible reports in the administrative record compiled by the Navy as part of the EIS, as well as by the EIS itself. "The noise impact depicted by noise exposure contours in the AICUZ is described by the day-night average sound level (Ldn) ... and is based upon the tempo of air operations, type and mix of aircraft and their flight characteristics. Studies have shown that noise contours provide the best method of quantifying and depicting noise impact. " OPANAV Instruction 11010.36A, page 24 (Exh. 9, App. 0699). *See*, *Branning v. United States*, 228 Ct. Cl. 240, 244 F.2d 88 (1981). The overriding legal issue in this case will be decided in the liability phase. Obviously, if the Government is found not liable, there will be no need to award damages. Such factual differences as may exist among the class, such as the assessed value of a given property, are entirely related to damages, and it is clear from the studies and the declarations of Mr. Hunsperger and Professor Nelson that there are established and recognized methodologies for determining the value of the property but for the effect of the jet noise, which constitutes the Taking.

> A final consideration is the factual differences involved in determining damages. If a damages phase is necessary, the court may devise a formula to apply to each claimant or decertify the class if the damages assessments become too cumbersome or speculative. The common legal question predominates over separate factual inquiries, and if this were to change, the court is free to decertify the class.

*Taylor*, *41* Fed. Cl. at 446 (emphasis supplied). Clearly, as the affidavits of Professor Nelson and Mr. Hunsperger establish, the process of devising and applying a damage formula has been done and is appropriate in this case.

In this case the central issue is the taking of an avigation easement by the Government. With respect to Plaintiffs' complaint and the elements of proof necessary to demonstrate either a class-wide

damage formula or the damages of an individual homeowner, the following will either be determined once in the class context or "relitigated over and over":

(a) The ownership of the property on or about July 1, 1998 when156 F/A-18s began to arrive at Oceana;

(b) The noise level and noise contour of the property prior to July, 1998

(c) The noise level and noise contour applicable to the property after July 1, 1998;

(d) The effect of noise as it applies to a residential property within the applicable post July 1, 1998 noise contour;

(e) The legal issue whether the facts demonstrated by (a) - (d) above establish a “Taking“ under Art. 5 of the U.S. Constitution;

(f) The amount by which the value of the property was diminished by the taking.

Clearly it makes little sense to require thousands of property owners to separately establish (a) through (e) above.

The common issues of the avigation taking, the intensity and duration of the aircraft noise and its effect on plaintiffs’ property are predominant common questions involving common proof. These questions are likely to be hotly contested, requiring the assistance of many experts to resolve, and they will require the largest devotion of time and resources by the parties and by the Court. These matters will clearly predominate at any trial. By handling such questions on a class wide basis, this Court can achieve an efficient, economical and fair resolution of these issues.

**Rule 23 (b)(3) Predominance of Common Issues**

Commonality is normally not an issue under Rule 23(a) but its importance arises under Rule 23(b) (3) which sets forth two key factors regarding commonality: Whether common questions predominate over questions affecting only individuals and whether a class action is the superior method of adjudicating the controversy. These two questions are obviously related. Courts finding that common questions predominate normally will find that a class action is also the superior method of resolving the case.

It is not necessary that all issues be common to each of the class members before the test is met. *Joseph v. General Motors*, 109 F.R.D. 635, 641 (D. Colo. 1986). If there are common issues relating solely to liability, predominance usually is held to exist even if there are individualized questions that relate to damages. *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 796 (10th Cir. 1970) and *Advisory Committee Notes to Rules of Civil Procedure, Rule 23*, 39 F.R.D. 69, 102-04 (1966).

**D. Quinault (4): Are the claims of the named plaintiffs typical of the class?**

Each of the named Plaintiffs owned residential property on July 1, 1998 and each such property thereafter came under a specific high noise contour which the science and the law recognize as severely adversely affected. Exh. 27 (App. 1075) is a map constructed by Dr. Morgan from GIS data that depicts the area of the two airfields, the noise contours, and the location of the properties of each of the Plaintiffs herein. Each plaintiff is suing for identical relief and is asserting the same cause of action. *Taylor*, 41 Fed. Cl. at 446; *Moore*, 41 Fed. Cl. [394]. No Plaintiff is requesting relief different from that requested for the entire class.

**E. Quinault (5): Has the government acted on grounds Applicable to the whole class?**

This criterion is established for essentially the same reasons as the typicality requirement. The arrival of the F/A-18s affected all of the Navy's neighbors.. See *Taylor*, 41 Fed. Cl. at 446; *Hannon*, 31 Fed. Cl. at 103; *Buchan*, 27 Fed.Cl. at 225; *Moore*, 41 Fed. Cl. At 394,

**Federal Rule 23 (a)(3) Typicality**

*Quinault* 4 and 5 overlap Federal Rule 23 (a)(3) which requires that "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class, . . . ." . The heart of this requirement is that the class representative's case be sufficiently similar to the class' claims to ensure that they will represent the claims of the whole class during the course of the litigation. *Steiner v. Equimark Corp.*, 96 F.R.D. 603, 609 (W.D. Pa. 1983). Most courts have held that the typicality requirement is met when the claims of the class representatives rest on the same legal theories and request the same remedies as the members of the class. *Newberg, supra*, §3.13.

**F. Quinault (6): Were the damages allegedly suffered by the individual class members so small that it is doubtful they would be otherwise pursued?**

One inquiry under this heading is whether the class members would pursue the claim if the class was not certified. See *Hannon*, 31 Fed. Cl. at 103-04. In *Favreau*, the estimated individual damages were up to $20,000 and that was held sufficient to satisfy this criteria. 2000 U.S. Claims LEXIS 227, *3. In the present case, the probable result must be balanced against the cost of producing that result. The average assessed value of a house in Virginia Beach for 1998 is $125,000. (Nelson, Exh. 16, ¶ 44, App. 1025-1026). Using Professor Nelson's methodology, the average damage to a property in the 65-79 dB zone is $13,125-$18,750. (Id., App. 1026). The average damage to a property in the >80 dB zone is $15,938-$28,125. (Id., ¶ 50, App. 1030). Many properties will suffer less damage than the average. Given the magnitude of the expert fees and other costs which would attend the preparation and trial of a single plaintiff's case, it is unlikely that very many class members would pursue their cause of action. This conclusion is buttressed by the observation that there is presently no active litigation by individual residential property owners known to Plaintiffs despite the enormous public controversy occasioned by the arrival of the jets more than two years ago.

> Another consideration under this criterion is whether there is a better alternative to resolve this dispute. As mentioned previously, the court favors the efficiency inherent in a class action Approach. The alternative methods, test cases, consolidation of cases, and permissive joinder, cannot efficiently adjudicate plaintiffs' claims in this case. Under the circumstances, the damages to individual class members are too slight to warrant individual litigation.

*Taylor*, 41 Fed. Cl. at 447.

**G. Quinault (7): Will the named plaintiffs adequately and fairly protect the interests of the class?**

The declarations of the Plaintiffs establish their interest and vigor in pursuing this case and counsel for the class are clearly able to adequately represent the interests of the class.

> Plaintiffs' attorneys are neither members of the class nor related to members of the class, and they do not have an economic stake in a positive outcome of the suit beyond the potential recovery of attorney

> fees. See *Kominers*, 3 Cl. Ct. at 686 (interests of the class were not adequately represented when representative of the class would unfairly profit from a ruling for plaintiffs); *Armitage*, 18 Cl. Ct. at 312. There is no evidence that counsel is incapable or lacks sufficient resources for the completion of the litigation. See *Black*, 24 Cl. Ct. at 478. Finally, there is fair and adequate representation when the representative is precluded from raising individual arguments and similarly situated persons are suing under the same statute. See *Moore*, 41 Fed. Cl. 394, 1998 U.S. Claims LEXIS 148,1998 WL 381732, at *5; *Hannon*, 31 Fed. Cl. at 104.

*Taylor*, 41 Fed. Cl. at 447. *Quinault also* states that "counsel must be qualified, experienced and generally able to conduct the proposed litigation". As the affidavit of Kieron Quinn (Ex. 28, App. 1076-1080) establishes, counsel for Plaintiffs in this case have significant experience in class and complex litigation, and are generally recognized as outstanding practitioners in the legal profession. Three of the attorneys are listed in the *Best Lawyers in America*, an honor based on peer recommendation.

**Federal Rule 23 (a)(4): Adequacy of Representation**

The requirement embodies concerns that the representatives and their attorneys will competently, responsibly and vigorously prosecute the suit. The standard is well settled. The plaintiffs must demonstrate an interest in the progress and outcome of the litigation, such as to satisfy the Court that the plaintiffs will vigorously prosecute the action. *In Re New York City Municipal Securities Litigation*, 87 F.R.D. 572 (S.D.N.Y. 1980). Beyond that, the personal qualities of the representative plaintiffs are not particularly relevant. *Simon v. Westinghouse Elec. Corp.*, 73 F.R.D. 480, 485 (E.D.Pa. 1977).

### H. Quinault (8): Is there a risk of inconsistent adjudications if individual actions are separately maintained?

> In *Moore*, the court concluded that the eighth Quinault criterion is no longer Applicable because the Federal Circuit hears all Appeals from the district courts and this court in cases involving requests for money damages from the government. See *Moore*, 41 Fed. Cl. 394, 1998 U.S. Claims LEXIS 148, 1998 WL 381732, at *5 (citing 28 U.S.C. § 1295 (1994)). The court agrees with the *Moore* court that this criterion is no longer relevant.

*Taylor*, 41 Fed. Cl. at 446. See also *Berkley*, 45 Fed. Cl. at 234; *Favreau*, 2000 U.S. Claims LEXIS 227, *3.

**I. Equitable Test: Does certifying this case as a class action serve the interests of justice?**

The Navy had to make a choice of where to move the F/A-18s. Having made that choice, the Navy also recognized that the move would have a very serious impact on a number of its neighbors around Oceana and Fentress. Concern over that impact is expressed in scores of places in the EIS. Justice and equity require that the financial impact of the avigation easement should fall generally on all citizens on whose behalf the Navy labors, and should not be shouldered solely by the neighbors of the Oceana and Fentress airfields whose property values are so directly affected by the aircraft.

> Under the circumstances of this case, certifying the class serves the interests of justice. The court believes that a class action is the most efficient method of resolving this case. Plaintiffs are similarly situated with relatively few factual distinctions among their claims. The use of a class action will be more efficient for both plaintiffs, defendant, and this court. As discussed previously, a class action will decrease the chances of duplicative litigation and inconsistent rulings. A class action will also be more cost effective for all parties involved. Finally, as demonstrated in the previous discussion, it is appropriate to use a class action approach because the case satisfies the Quinault criteria. Therefore, considering efficiency,costs of litigation, and the Quinault factors, it is in the interest of justice for the court to certify this class.

*Taylor*, 41 Fed. Cl. at 447-448.

**J. Certification of an Opt-out Class**

While the federal district courts uniformly certify damage classes on an opt out basis in Rule 23 (b)(3) damage cases [Rule 23 (b)(1) and (b)(2) classes require neither pre-trial notice nor an opt out opportunity] it is more common for this Court to certify opt-in classes. This preference goes back to *Quinault* itself. This Court since has certified both kinds but the opt-in class has been far more common.

In this action Plaintiffs request that the Court adopt an opt-out model. Under this procedure Plaintiffs would give each member of the class mailed and published notice of the pendency of the action, the theories of law being pursued and the relief being sought. The Class would be advised that

a successful resolution by judgment or settlement in favor of Plaintiffs would be followed by a claims procedure under which property owners who established their membership in the class would be compensated by the application of a formula established, or approved, by the Court.

The opt-out process in a case of this kind has obvious advantages. The management of an opt-in class of up to 20,000 identified and participating members presents some real, albeit unnecessary, obstacles to efficiency for the Court, the Defendant and the Plaintiffs. The type of damages sought by the class is uniform and lends itself to computation by a formula using a baseline, such as that described in the expert affidavits which support this motion. If a class member believes that the uniformity in the damages sought by the class does not properly describe her loss - for example, she has plans to re-zone the property for commercial use - the opt -out procedure is a perfect tool to afford her the opportunity to opt out and file an individual action which would accommodate that distinction. From the Defendant's point of view the opt-out approach accords maximum finality. The judgment or settlement will be binding on the identified class uniformly *Cooper v. Federal Reserve Bank*, 467 US 867, 874 (1984), without the necessity in the future of identifying a given property with its owner on July 1, 1998 and cross-referencing a list of owners who opted-in to find out whether a given parcel is then subject to an avigation easement.

This Court has ample power, and precedent, to adopt the opt-out procedure. In *Taylor*, Judge Tidwell made the opt-out choice in language which is highly persuasive:

> Past courts have argued against the use of an opt-out approach. The principal argument they rely upon is that it is improper to bind parties who fail to exclude themselves. See e.g. *Saunooke*, 8 Cl. Ct. at 329-30. This concern, though valid, is relatively minor when balanced against the problems associated with an opt-in approach. First, an opt-in approach places the court in the uncomfortable position of inviting persons to join litigation. See *Buchan*, 27 Fed. Cl. at 223-24; *Cooke v. United States*, 1 Cl. Ct. 695, 698 (1983). Second,the opt-in procedure amounts to little more that a permissive joinder rule. It is therefore of limited use in informing potential class members of the suit and the claimants' right to join the suit. See id. at 697 n.3. Third, with the opt-in method, the defendant loses the benefit of binding unidentified parties,which can lead to repetitive litigation and a risk of inconsistent verdicts. See id. Finally, and most importantly, considering the facts of this case and the characteristics of this class, an opt-out class will

> maximize the claims handled in one suit, and thus provide a just and efficient method to resolve the litigation.
>
> RCFC 23 is discretionary, giving the court power to determine whether to certify and in what manner to certify a class action. Nothing prevents the court from using a method that it deems to be more efficient and appropriate for the case.

*Taylor*, 41 Fed. Cl. at 447. Plaintiffs recognize that the opt-out choice made in *Taylor* has been criticized, see *Favreau*, 2000 U.S. LEXIS 227, *15, but nevertheless urge that this court has ample power and discretion to make either choice and that the opt-out choice is the superior method of dealing with the present case.

**Federal Rule 23**

The practice, as well as the rationale, underlying the opt-out procedure used in F.R.C.P. 23 (b)(3) classes is encapsulated in the following quote:

> The discouraging aspect of opt-in notice is that it tends to limit the number of class members, particularly if the notice gives no indication of the amount of the damages sought in the possible class recovery. Such affirmative opting-in was rejected in amended Rule 23.

*Newberg*, *supra* § 13.22.

## IV. CONCLUSION

For all the reasons set out in this memorandum and the supporting documentation Plaintiffs request that this Court certify the classes requested.

Kieron F. Quinn
Quinn Gordon &Wolf, Chtd.
40 W. Chesapeake Avenue, Suite 408
Towson, Maryland 2 1204
(410) 825-2300
(410) 825-0066 (fax)

Attorney of Record for
Plaintiffs under Rule 81(d)

Of Counsel:

Martin E. Wolf
Richard S. Gordon
Quinn, Gordon & Wolf, Chtd.
40 West Chesapeake Avenue, Suite 408
Towson, Maryland 21204
(410) 825-2300
(410) 825-0066 (fax)

Thomas Shuttleworth
Stephen C. Swain
Lawrence Woodward
Shuttleworth, Ruloff, Giordano & Swain, P.C.
Southport Centre, Suite 300
4525 South Boulevard
Virginia Beach, Virginia 23452-1137
(757) 671-6000
(757) 671-6004 (fax)

Jack E. Ferrebee
Jack E. Ferrebee, P.C.
Sandpiper Key, Suite 12B
1060 Laskin Road
Virginia Beach, Virginia 23451
(757) 425-2234
(757) 425-2217 (fax)

Charles R. Hofheimer
Kristen Hofheimer
Charles R. Hofheimer, P.C.
303 34th Street, Suite 8
Virginia Beach, Virginia 23451
(757) 425-5200
(757) 425-6100 (fax)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing Memorandum in Support of Motion for Class Certification was delivered this ___ day of ________ , 2001, by first class mail, postage prepaid to:

James Brookshire, Esquire
U.S. Department of Justice
501 Pennsylvania Avenue, Room 835
Washington, D. C. 20004-0663
(202) 305-0490